**MALLOY et al. v. FEDERAL RESERVE BANK OF RICHMOND et al.**

(District Court, E. D. North Carolina. July 8, 1922.)

No. 923.

1. Banks and banking ⇐171(1)—Payee, who deposited check with bank for collection, could sue other bank, to which check was forwarded for collection for negligence in course of collection.

Under a statute authorizing a bank in which a check is deposited for collection "to forward, en route, the same, without delay, in the usual commercial way in use according to the regular course of business of banks," a payee, who deposited check with a bank for collection, held entitled to sue other bank, to which the check was forwarded for collec-

⇐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tion by the first bank, for damages caused by negligence of the second bank in the course of collection, as against contention that there was no contractual relation between payee and second bank, since under such statute the second bank became the payee's subagent.

2. Statutes ☞174, 175—Construed to apply only to persons or corporations resident in state, unless otherwise clearly expressed.

In construing statutes, provisions in respect to persons coming within their scope will be construed to apply merely to citizens or corporations resident in the state, unless otherwise clearly expressed.

3. Banks and banking ☞171(3)—Federal Reserve Bank, to which check was sent for collection, held not negligent in sending check to drawee bank.

In view of regulation made by Federal Reserve Board providing that the board will require member and nonmember clearing banks to authorize its Federal Reserve Bank to send checks for collection to banks on which checks are drawn, and that except for negligence such Federal Reserve Bank will assume no liability, it was not negligence for a Federal Reserve Bank, to which a check had been sent for collection, to mail the check to the bank on which it was drawn.

4. Banks and banking ☞163—Drawer's liability held discharged.

Where drawee bank, to which the check had been sent for collection by other bank, sent other bank the drawee bank's check on third bank in payment thereof, stamped the check drawn on it paid, charged it to drawer's account, and delivered it to drawer, who had to his credit subject to his check an amount more than sufficient to pay check, the check was paid, and drawer's liability as such was discharged.

5. Banks and banking ☞161(3)—Bank to which check was sent for collection held not authorized to accept in payment drawee bank's check on other bank.

Bank to which check was sent for collection acted at its peril in accepting in payment of such check drawee bank's check on other bank, having no authority to accept in payment thereof anything other than money.

At Law. Action by D. J. Malloy and J. H. Malloy, trading as Malloy Bros., against the Federal Reserve Bank of Richmond and Napier H. G. Balfour. Judgment for plaintiff against first-named defendant, and denying plaintiff recovery against last-named defendant.

Sinclair & Dye, of Fayetteville, N. C., for plaintiff.

M. G. Wallace, of Richmond, Va., and Little & Barnes, of Raleigh, N. C., for defendant bank.

McCormick & Clark, of Fayetteville, N. C., for defendant Balfour.

CONNOR, District Judge. Action for recovery of amount of check alleged to have been lost by negligence of defendant, in course of collection. The parties waived trial by jury and submitted the case to the court to find the facts and render judgment thereon. The evidence disclosed the following facts:

Defendant Napier H. G. Balfour, on November 30, 1920, drew and sent to plaintiffs by mail at Quitman, Ga., his check for $9,000 on the Lumber Bridge Bank, a duly chartered and organized corporation authorized to carry on the business of banking at Lumber Bridge, N. C., to be applied to the credit of his indebtedness to plaintiffs, evidenced by his note, secured by mortgage on real estate situate in North Carolina. Plaintiffs received the check on the morning of December 1, 1920, credited the amount on Balfour's note, and sent the check, properly indorsed, with a deposit slip, on same day to Perry Banking Company,

at Perry, Fla., at which place said banking company was engaged in the banking business. The Perry Banking Company, on December 3d, received the check for collection and credit, and on the next day sent to plaintiff a credit card, on which was printed:

"Checks, drafts, etc. received for collection or deposit, are taken at the risk of the indorser until actual payment is received."

The Perry Banking Company, on the same day, indorsed and sent the check to the Atlantic National Bank, of Jacksonville, Fla., and on December 6, 1920, said bank indorsed and sent it to the branch of Citizens' & Southern Bank at Atlanta, Ga. The said bank, December 8, 1920, indorsed the check with the double indorsement stamp of itself and the Federal Reserve Bank of Atlanta, and sent it to the Federal Reserve Bank of Richmond for collection and credit to the Federal Reserve Bank of Atlanta, Ga.; the Citizens' & Southern Bank of Atlanta being a member of the Reserve Bank of Atlanta, Ga.

On December 10, 1920, the Federal Reserve Bank of Richmond sent to the Bank of Lumber Bridge a letter containing the Balfour and several other checks, drawn upon said bank, aggregating $9,356.44, for collection and remittance. This letter, by due course of mail between Richmond and Lumber Bridge, should have been received by the Bank of Lumber Bridge on Saturday, December 11, 1920. On Tuesday, December 14th, the cashier of the Lumber Bridge Bank stamped the Balfour check "Paid" and charged it to the account of Balfour, on which there was to his credit, subject to check, $9,204.90. On the same day the Lumber Bridge Bank drew and mailed to the Federal Reserve Bank of Richmond its check on the Atlantic Banking & Trust Company of Greensboro, N. C., for the sum of $9,204.90, the aggregate amount of the checks sent to said bank by the Federal Reserve Bank of Richmond in its letter of December 10th, less the amount of checks on said bank for which the drawees did not have balances sufficient to pay.

The Federal Reserve Bank of Richmond received said letter, containing the check December 15, 1920, and on same day forwarded the check to the drawee, Atlantic Banking & Trust Company, of Greensboro, N. C., for payment. On December 17, 1920, the Atlantic Banking & Trust Company wired the Federal Reserve Bank of Richmond that the Lumber Bridge Bank did not have sufficient funds to its credit to pay said check. The defendant Richmond Bank, on the same day, wired the Lumber Bridge Bank notice of the dishonor of its check, calling upon said bank to make the check good, which wire the Lumber Bridge Bank answered, promising to do so.

Upon its failure to make the check good, the defendant Richmond Bank sent a representative to Lumber Bridge, who reached there on the morning of December 20, 1920, being Monday, saw the cashier of the Lumber Bridge Bank, and demanded payment of the check on the Greensboro Bank. The cashier stated that the bank did not have sufficient funds to pay the amount of its dishonored check on the Greensboro Bank; that the directors of the bank would meet that night and make an effort, by indorsing a note of the bank to the Bank of Lum-

berton, N. C., upon which the bank would be able to secure funds with which it could pay the amount of the dishonored check.

On Tuesday morning, December 21, 1920, the cashier of the Lumber Bridge Bank informed the representative of defendant Richmond Bank that the directors refused to indorse the note with which to secure funds and that he could not pay or take up the check. Defendant the Federal Reserve Bank of Richmond, on the same day, wired the Citizens' & Southern Bank of Atlanta that the Balfour-Malloy check was unpaid, and on same day sent a letter to said bank, stating the facts in connection therewith, and that the amount of the check, $9,000, would be charged to the account of said bank, if the check of the Lumber Bridge Bank was not ultimately paid. Malloy Bros. were promptly notified of the situation. Upon being notified by Malloy, Balfour was informed by the cashier of the Lumber Bridge Bank that he could not make the check on Greensboro good. Upon appropriate proceedings under the North Carolina statutes, on December 24, 1920, the Lumber Bridge Bank was closed and its assets placed in the custody of a receiver.

The defendant Richmond Bank charged the amount of the check to the Federal Reserve Bank of Atlanta, which charged same to the Citizens' & Southern Bank. The several banks handling the check charged the amount to their several correspondents until it was charged back to Malloy Bros. by the Perry Banking Company. At the date of the institution of this action no dividends had been paid by the receiver. The defendant Federal Reserve Bank of Richmond retained the check on Greensboro. Upon the trial it was stated that there was reasonable cause to believe that a dividend of 75 per cent. would be paid.

The Bank of Lumber Bridge was not a member of the Reserve Bank system, but had prior to the date of this transaction, pursuant to the regulations of the Federal Reserve Board (October, 1920, regulation J) entered into an arrangement with said bank for the collection of checks drawn upon it at par. The regulation (1) provides that—

"Each Federal Reserve Bank will receive at par from its member banks and from nonmember clearing banks, in its district, checks drawn on all member and nonmember clearing banks, and on all other nonmember banks which agree to remit at par through the Federal Reserve Bank of this district.

The same privilege is extended to—

(2) "Federal Reserve Banks to receive checks for collection from other Federal Reserve Banks and from all member and nonmember clearing banks regardless of their location. * * * Checks drawn upon all member and nonmember clearing banks of its district and upon all other nonmember banks of its district whose checks are collected at par by the Federal Reserve Bank."

This action was brought in the superior court of Cumberland county, N. C., and upon petition of defendant bank removed into this court. Plaintiffs, following the allegations covered by the foregoing facts, allege:

"That, as plaintiffs are informed and believe, the defendant Reserve Bank of Richmond negligently mailed said check to the said Bank of Lumber Bridge, and negligently accepted in payment thereof the latter's draft on a bank in Greensboro, N. C., which check **the drawee** bank on December 14, 1920, mark-

ed "Paid" and charged to the account of the drawer, and subsequently charged to the defendant Napier H. G. Balfour.

"That Balfour had, at the time said check was charged against his account, to wit, December 14, 1920, on deposit with said Bank of Lumber Bridge an amount sufficient to pay said check of nine thousand dollars ($9,000).

"That the defendant Federal Reserve Bank of Richmond carelessly and negligently failed to notify plaintiffs that it had not received the money for said check until December 21, 1920, * * * and that, as plaintiffs are informed and believe, had the defendant bank notified them of the nonpayment of said check promptly, as it was its duty to do, they and the defendant Balfour could and would have collected the said check.

"That, as plaintiffs are informed and believe, the defendant Federal Reserve Bank of Richmond acted as their agent, and that it was careless and negligent in sending said check direct to the drawee bank, in accepting its draft on the Greensboro Bank, in surrendering said check to the Bank of Lumber Bridge, N. C., without having collected the money therefor, and in failing to notify plaintiffs until December 21, 1920, that it had not collected said check."

In the light of these allegations, several of the questions discussed by counsel become immaterial.

[1] Defendant's counsel insist that plaintiffs cannot maintain the action because there is no contractual relation, or privity of contract, between plaintiffs and defendant the Federal Reserve Bank of Richmond. This argument is based upon the theory that the check became the property of the Perry Banking Company upon its deposit, or that said banking company was not authorized, by the deposit of the check for collection, to appoint subagents for that purpose, and that such other banks as it transmitted the check to became its agents, and not the agents of the owners of the check. This view was, upon the facts in that case, adopted by the Supreme Court of Florida in Brown v. People's Bank, 59 Fla. 163, 52 South. 719, 52 L. R. A. (N. S.) 608. It is not necessary to do more than refer to the very interesting and learned discussion by Chief Justice Whitfield in that case, because he states, at the conclusion of his opinion, that since the transaction out of which that case arose, but before the decision, the Legislature of Florida enacted a statute by which it is provided that:

"When a check * * * is deposited in a bank * * * for collection, it shall be considered due diligence on the part of the bank in the collection of any check," etc., "so deposited, to forward en route the same without delay in the usual commercial way in use according to the regular course of business of banks, and that the maker," etc., "shall be liable to the bank until actual payment is received." Laws 1909, c. 5951, § 1 (Comp. Laws 1914, § 3004a).

For the purpose of this discussion the statute authorized the Perry Banking Company to employ subagents in making collection of the check, with the result that such subagents became the agents of the owner of the check. This statute crystallizes into positive law of the state the rule which has been adopted in other jurisdictions as the proper method to be pursued and the extent of liability of collecting banks in such cases. This principle has been clearly stated by Judge Bynum, upon the authority of Fabens v. Mercantile Bank, 23 Pick. (Mass.) 330, 3 Am. Dec. 59; Bank v. Bank, 75 N. C. 534, that:

"It is well settled that, when a note is deposited with a bank for collection which is payable at another place, the whole duty of the bank so receiving the note in the first instance is seasonably to transmit the same to a suitable bank or other agent at the place of payment; and as a part of the same doctrine it

is well settled that, if the acceptor of a bill or promisor of a note has his residence in another place, it shall be presumed to have been intended and understood between the depositor for collection and the bank that it was to be transmitted to the place of residence of the promisor."

The rule is stated, with citation of authorities pro and con, in 2 Michie on Banks and Banking, § 162 (2). This rule is usually referred to as the "Massachusetts rule." In Exchange National Bank v. Third National Bank, 112 U. S. 276, 5 Sup. Ct. 141, 28 L. Ed. 722, Justice Blatchford said:

"The authorities which support this rule rest on the proposition that, since what is to be done by a bank employed to collect a draft payable at another place cannot be done by any of its ordinary officers or servants, but must be intrusted to a subagent, the risk of the neglect of the subagent is upon the party employing the bank, on the view that he has impliedly authorized the employment of the subagent"—citing Dorchester Bank v. New England Bank, 1 Cush. (55 Mass.) 77; Milling Co. v. Kuenster, 158 Ill. 259, 41 N. E. 906, 29 L. R. A. 794, 49 Am. St. Rep. 156, and many other decisions.

The result of this rule is that the subagent, selected by the bank undertaking to collect the check, becomes the agent of the owner of the check, thus establishing the contractual relation between the owner and such subagent, and entitling the owner to sue either of the subagents for breach of duty. Bank v. Floyd, 142 N. C. 187, 55 S. E. 95; Winchester Milling Co. v. Bank of Winchester, 120 Tenn. 225, 111 S. W. 248, 18 L. R. A. (N. S.) 441.

It is in recognition of this principle that plaintiffs sue the defendant Federal Reserve Bank of Richmond, alleging the relation of principal and agent and breach of duty, in that the defendant Federal Reserve Bank negligently sent the Balfour check for collection to the drawee Bank of Lumber Bridge, thus eliminating several questions discussed by counsel and narrowing the controversy to two questions: (1) Was the defendant Richmond Bank negligent in sending the check to the drawee bank for collection? (2) Was the defendant guilty of negligence in accepting the check of the Bank of Lumber Bridge on the Greensboro Bank in payment of the Balfour check?

From this viewpoint no question respecting the manner or time in which the Perry Banking Company and its subagents forwarded the check to the several banks and presented it to the drawee for payment is presented. It will tend to simplification of the issues raised by the pleadings and the facts, in respect to which there is no controversy, to ascertain the extent of the liability of defendant bank, by regarding the relation between the parties to this action as principal and agent, as alleged by plaintiffs.

Approached from this viewpoint, the first question for decision is whether the defendant Federal Reserve Bank was negligent in the discharge of its duty by sending the check to the drawee Bank of Lumber Bridge. This question has been the subject of much discussion, resulting in differing conclusions. The general principle is stated in Michie on Banks and Banking, vol. 2, § 162 (1b), with citation of authorities. The Supreme Court of North Carolina in Bank v. Floyd, 142 N. C. 187, 55 S. E. 95, held that it was negligent in a bank, having a draft for collection, to send it directly to the drawee, that the fact

that the drawee was the only bank at the place of payment did not affect the principle, and that no custom to the contrary would excuse the sending bank. The writer of this opinion, writing for the court in that case, gave the subject careful investigation and cited the controlling authorities. The Legislature of North Carolina, however, at its session of 1919 (Public Laws, c. 169, now section 233, Consolidated Statutes), changed the law in that respect, by enacting a statute providing that—

"Any banking corporation or banking or trust company, doing a fiduciary business, hereinafter called the bank, doing business in this state, receiving for collection or deposit any check * * * drawn upon or payable at any other bank, located in another city or town whether within or without this state, may forward such instrument for collection directly to the bank on which it is drawn or at which it is made payable, and such method of forwarding direct to the payer shall be deemed due diligence; and the failure of such payer bank, because of its insolvency or other default, to account for the proceeds thereof, shall not render the forwarding bank liable therefor: Provided, such forwarding bank shall have used due diligence in other respects in connection with the collection of such instrument. The provisions of this section shall not apply where there is more than one bank in a town."

[2] Plaintiffs insist that the defendant Federal Reserve Bank of Richmond is not within the terms of this statute, and can claim no immunity under its provisions, because it is not a banking corporation or banking or trust company "doing a fiduciary business in this state." I incline to an agreement with plaintiffs' contention that the statute was intended, and its terms apply only to banks organized and doing business in the sense of having its principal office, in this state. It is a well-settled principle, adopted in the construction of statutes, that their provisions in respect to persons coming within their scope, are confined to citizens or corporations resident in the state, unless otherwise clearly expressed.

[3] This question, however, becomes immaterial in this case, because regulation J (8) made by the Federal Reserve Board provides that:

"In handling items for member and nonmember clearing banks, a Federal Reserve Bank will act as agent only. The board will require that each member and nonmember clearing bank authorize its Federal Reserve Bank to send checks for collection to banks on which checks are drawn, and, except for negligence, such Federal Reserve Bank will assume no liability."

This regulation, to the extent of its permissive provisions, must be taken to have been known to the Citizens' & Southern Bank at Atlanta and the Federal Reserve Bank at Atlanta. The check was sent by them and received for collection by the defendant Reserve Bank of Richmond, subject to the regulation which permitted the Richmond Bank to send the check to the drawee Bank of Lumber Bridge. This was done promptly. The check was mailed at Atlanta December 8, 1920, mailed by the defendant Federal Reserve Bank, December 10, 1920, and received by the Lumber Bridge Bank December 11, 1920, being Saturday. The Lumber Bridge Bank was the only bank in the town of Lumber Bridge. There is no suggestion that, at that time, it was not in good standing and credit, or that defendant Federal Reserve Bank of Richmond had any cause to question its solvency or manner

of conducting its business. It had made "a par collection" agreement with defendant bank.

I am led to the conclusion that the defendant Federal Reserve Bank of Richmond was not negligent in sending the check to the Lumber Bridge Bank for collection, and that it acted in that respect promptly and in accordance with the terms upon which it accepted and undertook to act as agent in collecting the check.

[4, 5] We are thus brought to the last and determinative averment of negligence: The acceptance by the defendant Federal Reserve Bank of Richmond of the check of the Lumber Bridge Bank on the Greensboro Bank. Preliminary to the decision of this question, it becomes material to ascertain what effect the conduct of the Lumber Bridge Bank had upon the status of the Balfour check and his liability thereon as drawer. In Bank v. Floyd, supra, it was conceded that, by charging the check to the account of the drawer, its depositor, who had to his credit a balance sufficient to pay it, and canceling it, by the Dunn Bank, occupying in that case pro hac vice the position of the Lumber Bridge Bank, the check was paid and the drawer released. In Bank v. South Weymouth Bank, 184 Mass. 49, 67 N. E. 670, the note of a customer of the defendant bank, payable at that bank, and due, was sent by the holder, indorsed "For collection and remittance" to the defendant bank. The makers of the note had to their credit and subject to check in the defendant bank an amount sufficient to pay the note. Describing the conduct of the cashier of the defendant bank, Hammond, J., says:

"He intends as agent of the makers to pay this note to his own bank, the indorsee and holder, and as such entitled to receive payment and discharge the note. He intends as cashier of his own bank to cancel and discharge the note when paid, and then as agent for the makers to hold the paid note for them. After the note has been paid, he intends to send the proceeds to the plaintiff. With these intentions he begins. The note is before him. He first draws on a bank in Boston his check as cashier of the defendant, payable to the order of the plaintiff, for the amount of the proceeds of the note. It is to be observed that this is not the check of the makers, nor is it made by the cashier as their agent, but in his capacity as agent of the defendant, and in the performance, not of duty owed by the makers, but of a duty owed by the defendant to the plaintiff. It is not the check by which the note was paid, because none was needed, but was the check by which the proceeds were to be transmitted by the defendant to the plaintiff. He then makes a memorandum of this check upon a block, stamps upon the face of the note. 'Paid Oct. —— 1901,' * * * and perforates [it] in three places, and puts the note, thus stamped and mutilated, in the file with his checks, so that a proper record of the transaction may be entered at the end of the day upon the permanent books." The cashier, at this time, was "called to the phone and notified that the makers" of the note "have made an assignment for the benefit of their creditors, and is requested by the assignee to hold the account. * * * He withheld the check he had drawn and undertook to retrace his steps."

In an action by the bank owning and sending the note to the defendant bank for the proceeds of the note, "in assumpsit for money had and received," the court held that—

"prior to the call to the telephone, the note had been paid by the makers to the defendant, and that the only remaining duty resting upon the defendant was to remit the proceeds to the plaintiff. * * * The note was itself equivalent to a check. * * * When the bank, through its cashier, wrote upon the face of the note, in its own name, as the indorsee and holder, that it was paid, and perforated it and put it in the files as a thing paid, nothing more was to

be done as to the payment. By those acts there had been set apart and appropriated, to the payment of the note, so much of the deposit then standing to the credit of the makers as was sufficient for that purpose, just as though the makers had presented to the bank their check in payment of a note due it from them."

With appropriate changes and arrangement of the parties, the case is, in all essential respects, on "all fours" with the instant case, and the conclusion irresistable the same to which the Massachusetts court came. The same conclusion was reached by the Supreme Court of Tennessee in Milling Co. v. Bank, 120 Tenn. 225, 111 S. W. 248, 18 L. R. A. (N. S.) 441, in which it was held that:

"Where a check, given by a debtor on a certain bank in payment of his debt, was by another bank acting as collector for the creditor and payee forwarded, for collection or payment, to the drawee bank, in which there was more than enough money on deposit to the credit of the drawer at the time the check arrived there to pay the same, whereupon the drawee bank drew its draft upon another bank for the amount of the check, and forwarded the same to the collecting bank, and charged, canceled, and surrendered the check to the drawer, he was thereby discharged from liability on the debt."

In that case it was held that the owner of the original check, by receiving the worthless check, ratified its acceptance by the collecting bank. Corporation Commission v. Bank, 137 N. C. 697, 50 S. E. 308. It is well settled by these and other authorities, as well as upon principle, that when the cashier of the Lumber Bridge Bank stamped the check "Paid," charged it to his account, and delivered it to Balfour, who had to his credit, subject to his check, an amount more than sufficient to pay his check, that the check was paid and his liability as maker or drawer discharged.

The Lumber Bridge Bank on December 14, 1920, had credit balances as follows: Atlantic Banking & Trust Company, Greensboro, $6,225.-01; American National Bank, $8,157; Merchants' National Bank, $3,-000; the National Bank, $2,549.96; cash, $4,574.69; Merchants' National Bank, Raleigh, $379.75—aggregating $16,810.98. The dealings between the Lumber Bridge Bank and the Atlantic Banking & Trust Company, between December 14th and December 18th, did not materially change the state of its accounts, nor does it appear that the available assets of the Lumber Bridge Bank were reduced prior to December 24, 1920.

The question is presented what, upon this state of the case, was the measure or standard of duty owed by the defendant Federal Reserve Bank of Richmond to the plaintiffs, owners of the check, in respect to the receipt from the Lumber Bridge Bank of its check on the Greensboro Bank. The authorities appear to be practically uniform in holding that, in the absence of any instruction or permission from the owner of the check, or any custom brought to the notice of such owner, to the contrary, the bank had no authority to accept or receive in payment of the check intrusted to it for collection anything other than money. Among many other decided cases, the following are cited as sustaining this proposition:

In Ward v. Smith, 7 Wall. (74 U. S.) 447, 19 L. Ed. 207, Justice Field says:

"When the instrument is lodged with the bank for collection the bank becomes the agent of the payee or obligee to receive payment. The agency extends no further, and without special authority an agent can only receive payment of the debt due his principal in the legal currency of the country, or in bills which pass as money at their par value by the common consent of the community." Midland National Bank v. Brightwell, 148 Mo. 358, 49 S. W. 994, 71 Am. St. Rep. 608.

In Fifth National Bank v. Ashworth, 123 Pa. 218, 16 Atl. 597, 2 L. R. A. 493, Paxson, J., says:

"It is safe to say, as a general rule, that when a bank receives a check from one of its depositors for collection, it must return him the check or the money. It is also equally clear that if the collecting bank surrenders the check to the bank upon which it is drawn, and accepts a cashier's check, or other obligation, in lieu thereof, its liability to its depositor is fixed, as much so as if it had received the cash. It has no right, unless specially authorized to do so, to accept anything in lieu of money."

In that case, W. gave to A. his check on the Penn Bank. On the same day A. indorsed the check to the Fifth National Bank, with which he was a depositor, which sent the check to the Penn Bank and received in return therefor a cashier's check, delivering to A. his check. The cashier's check was protested for nonpayment and the Penn Bank went into liquidation. The judge said:

"The plaintiff [Ashworth] has neither his check nor his money. Watson's account with the Penn Bank was good when the account was charged up to him. I am unable to see, therefore, that the plaintiff has any remedy against either Watson or the Penn Bank."

In National Bank v. Am. Exch. Bank, 151 Mo. 320, 52 S. W. 265, 74 Am. St. Rep. 527, the court quotes with approval 2 Daniel on Negotiable Instruments (4th Ed.) § 1625:

"In the United States it is quite certain that a banker, or other agent, holding a bill or note for collection, would act at his peril in delivering up a receipt or a check for the amount; and that if the debtor did not pay the amount in money, and the drawer or indorsers were not duly notified, they would be discharged, and the loss would fall on the collecting agent. * * * This seems to us the correct doctrine, for the agent exceeds authority in taking the check, and therefore acts at his peril. And while it may be, and as a general rule undoubtedly is, the practice of creditors, in mercantile communities, to take checks in the collection of debts, and frequently to surrender other instruments on receiving them, such a practice, on the part of the principal, falls far short of a usage which would permit the agent to do likewise." Bank v. Cummings, 89 Tenn. 609, 18 S. W. 115, 24 Am. St. Rep. 618.

There is no evidence of any custom existing, either in Virginia or North Carolina, by which collecting banks are authorized to accept from their agents or subagents, or from the drawee banks, in settlement of collections sent them, anything other than money in settlement of such collections. Plaintiff J. H. Malloy testified that he was engaged in the lumber business and knew—

"very little about the workings of a bank; did not instruct the Perry Banking Company; just sent the check down there for credit during the course of business."

I am of the opinion that the defendant Federal Reserve Bank of Richmond was not authorized to accept, in payment of the proceeds of the check from the Lumber Bridge Bank, its check or draft on the

Greensboro Bank, and that in doing so it was negligent, or probably, to state the situation more clearly, it exceeded its authority and is liable to plaintiffs for the amount of the Balfour check, unless it may reduce the amount by showing that on the date of its acceptance, December 15, 1920, it was impossible for the Lumber Bridge Bank to pay the amount in money or its equivalent.

The Lumber Bridge Bank had, on December 14th, $16,810, and, so far as appears, on December 24, 1920, when it went into the hands of a receiver cash, $4,574.00, and which, with balances in other banks, aggregated about $11,000. It held also bills and notes to an amount not stated in the evidence. It was not until the last named day that a receiver was appointed. During this time the plaintiffs were without any remedy against Balfour, whose check was paid on December 14th, or the Lumber Bridge Bank, whose check was held, and is now held, for the proceeds of the Balfour check by defendant bank. I am of the opinion that, upon the undisputed facts, the defendant Reserve Bank of Richmond is liable to the plaintiffs for the amount of the Balfour check.

Judgment will be signed that defendant Balfour is not liable as maker or drawer of the check, and that plaintiffs recover of defendant Federal Reserve Bank of Richmond $9,000, with interest from December 14, 1920, and the cost, to be taxed by the clerk.